# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| MICHAEL L. LANSDALE, | Civil No. 16-4106 (JRT/BRT) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S POST-TRIAL MOTIONS** |
| UPS SUPPLY CHAIN SOLUTIONS, INC., | |
| Defendant. | |

Thomas E. Glennon, **THOMAS E. GLENNON, P.A.**, 4900 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for plaintiff.

Donald M. Lewis and Sarah B. C. Riskin, **NILAN JOHNSON LEWIS PA,** 120 South Sixth Street, Suite 400, Minneapolis, MN 55402, for defendant.

Plaintiff Michael Lansdale brings a renewed motion for judgment as a matter of law and a motion for a new trial, or in the alternative, to amend the judgment. Because the Court finds that sufficient evidence supports the jury's verdict and that a new trial is not warranted, the Court will deny Lansdale's motions.

## BACKGROUND

Lansdale was a Region Sales Manager who worked for Defendant UPS Supply Chain Solutions ("UPS"). (Mem. Op. and Order at 2, Aug. 17, 2018, Docket No. 237.) The position required him to travel nearly every week of the year. (*Id.*) It also required him to use a corporate credit card for expenses incurred during that travel. Lansdale's

usage of the corporate credit card was governed by several UPS policies, which prohibited Lansdale from using the credit card for personal purchases. (*Id.* at 3.)

After an internal UPS audit revealed inconsistences in Lansdale's credit card use and Lansdale's credit card expense reports, UPS began an internal investigation, led by Security Investigator Erika Faifer. (*Id.*) UPS believed that Lansdale was using his corporate card for personal purchases. (*Id.*) When asked why an employee might do this, UPS's Director of Human resources Angie Brewer noted that, in her experience with employees who used their corporate cards for personal purchases, it was often to cover up an affair or a drinking problem. (*Id.*)

Faifer eventually compiled a report which noted several questionable expenses and submitted the report to her supervisor and a Human Resources manager named Herman Gonzales. (*Id.* at 4.) Faifer's report also noted significant inconsistences between Lansdale's purchases and the monthly expense reports he submitted to his own supervisor. (*Id.*) After reviewing the report and relevant receipts, UPS's investigation team came to believe that Lansdale was using his corporate card for personal purchases and then covering it up on his expense reports. (*Id.*) Both were against UPS policy. (*Id.*)

In furtherance of the investigation, and to determine whether UPS would take any action, Faifer and Gonzales interviewed Lansdale. (*Id.* at 5.) During this interview, Faifer and Gonzales asked a number of questions related to Lansdale's expense reports and his corporate card usage. (*Id.*) They also asked Lansdale whether he had a drinking problem and questions about his drinking in general. (*Id.*) Towards the conclusion of the interview, Lansdale wrote a statement acknowledging that he would sometimes use his corporate card

to hide alcohol-related charges from his wife. (*Id.* at 6.) At that point, Gonzales left the room to speak with his managers about the interview and written statement. While Gonzales was gone, Faifer continued to talk with Lansdale, and the two discussed his drinking habits extensively. (*Id.* at 6-7.) The next day, UPS terminated Lansdale. (*Id.* at 8.)

Lansdale thereafter brought this disability-discrimination action against UPS, alleging that UPS violated the Americans with Disabilities Act ("ADA") and the Minnesota Human Rights Act ("MHRA") in connection with his termination. At trial, he alleged that UPS impermissibly discriminated against him because of his disability and/or that UPS discriminated against him because it regarded him as disabled. He further alleged that, through the interview with Faifer and Gonzales, UPS violated the ADA by subjecting him to prohibited disability-related inquiries. UPS, on the other hand, argued that it did not discriminate against Lansdale because of a disability, did not regard him as having a disability, and did not engage in prohibited disability-related inquiries. Instead, UPS asserted that it terminated Lansdale because it believed that he violated UPS policies regarding corporate credit card use.

After a trial, a jury returned a verdict in favor of UPS on all counts. Lansdale then filed the present post-trial motions for judgment as a matter of law ("JMOL") and for a new trial. (Mot. for JMOL, Mar. 5, 2019, Docket No. 383.) In general, Lansdale argues that the jury's verdict was against the weight of the evidence and that the Court made legal errors which substantially influenced the trial.

**DISCUSSION**

**I.      RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

**A.      Standard of Review**

Under Rule 50(a)(1) of the Federal Rules of Civil Procedure, the Court may resolve an issue as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  A party may renew a motion for judgment as a matter of law after trial.  Fed. R. Civ. P. 50(b).  "A motion for judgment as a matter of law should be granted when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party."  *Hunt ex rel. Hunt v. Lincoln Cty. Mem'l Hosp.*, 317 F.3d 891, 893 (8th Cir. 2003) (quoting *Neely v. Am. Family Mut. Ins. Co.*, 123 F.3d 1127, 1129 (8th Cir. 1997)). In making this determination, the Court is to:

> consider the evidence in the light most favorable to the prevailing party, assume that the jury resolved all conflicts of evidence in favor of that party, assume as true all facts which the prevailing party's evidence tended to prove, give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts, and deny the motion, if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence.

*Atlas Pile Driving Co. v. Dicon Fin. Co.*, 886 F.2d 986, 989 (8th Cir. 1989)).  A motion for judgment as a matter of law should generally be denied unless the Court, keeping all these principles in mind, concludes that judgment cannot be entered on the jury verdict. *Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1551 (Fed. Cir. 1989) (applying Eighth Circuit law).

Lansdale asserts that he is entitled to judgment as a matter of law on both his disability-related inquiries claim and his disability discrimination claims.

### B. Disability-Related Inquiries

Under the ADA, an employer "shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). The ADA's provisions prohibiting employers from making disability-related inquiries extend to all employees, irrespective of whether they have a disability. *Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007). However, to sustain a claim, the employee must show that the prohibited inquiries caused a tangible injury. *Cosette v. Minn. Power & Light*, 188 F.3d 964, 970 (8th Cir. 1999).

Lansdale's disability-related inquiries claim was based mostly on the interview conducted by Faifer and Gonzales. He contended at trial that Faifer and Gonzales asked him impermissible disability-related questions and that he was fired based on his responses. At trial, it was established that Gonzales and Faifer jointly asked Lansdale several questions about his drinking habits. UPS submitted evidence that, after this discussion, Lansdale wrote and signed a statement acknowledging that he used his corporate card for personal charges in order to hide his alcohol consumption from his wife. It was further established that, as Gonzales was in a different room speaking with management, Faifer and Lansdale spoke extensively about Lansdale's drinking habits and how his drinking affected his health and family. Finally, it was established that Lansdale was informed of his termination the morning after the interviews.

Lansdale argues that, considering the above evidence, the jury's verdict on this claim was contrary to the evidence because it was shown that UPS engaged in prohibited inquiries, that the inquires led to his termination, and that the inquiries were not job-related or consistent with business necessity.

To overturn the jury's verdict, the Court must find that a jury would not have a legally sufficient basis to find for UPS, considering all evidence in a light most favorable to UPS and affording UPS the benefit of all favorable inferences which may reasonably be drawn from the facts. The Court cannot make such a finding. The jury had a sufficient evidentiary basis to find that, even if the questions posed to Lansdale were disability-related inquiries, the inquiries did not cause his termination. Lansdale's written statement acknowledged that he used his corporate card for personal use, and the jury could have found that this admission by itself was the reason for his termination. Further, UPS submitted extensive evidence throughout the trial highlighting what the relevant UPS decisionmakers knew regarding Lansdale's corporate card use and the significant discrepancies between what Lansdale purchased with his corporate card and what his expense reports indicated. The relevant decisionmakers also testified that the decision to terminate Lansdale was not based on his interview and was made before the interview even occurred.

Lansdale, on the other hand, submitted very little evidence that the prohibited inquires led to his termination. He relied at trial—and continues to rely—on the sequential nature of the events. He argues that because Gonzales and Faifer asked alcohol-related questions before calling UPS management, and Lansdale was afterwards terminated, his

termination was due to these questions and answers. However, this argument is based purely on speculation and the jury was free to reject it. While the Court acknowledges that the sequence of events is questionable, the Court does not find that, considering the evidence presented by UPS, the jury did not have a legally sufficient basis on which to base its verdict. Accordingly, the Court will deny Lansdale's Renewed Motion for Judgment as a Matter of Law as to Lansdale's prohibited inquiries claim.

### C.      ADA and MHRA Discrimination Claims

Lansdale also brought claims under the ADA and the MHRA asserting that UPS discriminated against him because of his disability or because it regarded him as disabled. The ADA and the MHRA prohibit employers from discriminating against employees on the basis of disability. 42 U.S.C. § 12112(a). Such protections extend to people who have "a physical or mental impairment that substantially limits one or more major life activities" and to people who are "regarded as having such an impairment." *Id.* § 12102(1). Alcoholism generally qualifies as a disability under either the MHRA and the ADA. *Miners v. Cargill Commc'ns, Inc.*, 113 F.3d 820, 823 n.5 (8th Cir. 1997); *Khalifa v. Gruys, Johnson & Assocs.*, 407 N.W. 2d 733, 735 (Minn. Ct. App. 1987).

To establish an ADA or MHRA discrimination claim, Lansdale needed to prove at trial that: (1) he had a disability; (2) his disability substantially limited one or more major life activities; (3) he could have performed the essential functions of his job when he was terminated; and (4) UPS knew of his disability and his disability was a "motivating factor" in UPS's decision to terminate him. (Special Jury Verdict at 1-2, 3, Jan. 25, 2019, Docket No. 377.) To prove his "regarded as" disabled claim, Lansdale needed to prove that:  (1)

UPS regarded him as having a disability; (2) he could have performed the essential functions of his job when he was terminated; and (3) UPS's belief was a motivating factor in its decision to terminate him. (*Id.* at 2, 4-5.)

"Major life activity" was defined by the Court as including "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating and working." (Jury Instructions at 15, Feb. 7, 2019, Docket No. 382.) "Motivating factor" was defined by the Court as "a reason, alone or with other reasons, on which UPS relied when it terminated Mr. Lansdale." (*Id.* at 16.)

### 1. Discrimination Claim

Lansdale asserts that he is entitled to judgment as a matter of law as to his ADA and MHRA discrimination claims. He argues that the evidence he presented clearly established each element and that a reasonable jury would not have a sufficient basis to find otherwise. UPS, on the other hand, argues that Lansdale failed to establish that he had a disability, that his disability substantially limited a major life activity, and that his disability was a "motivating factor" for his termination.

The Court finds that a reasonable jury would have a legally sufficient basis to find for UPS on this claim. First, a reasonable jury could conclude that Lansdale did not suffer from a disability, in this case alcoholism. It is true, as Lansdale points out, that he presented evidence suggesting that he suffered from alcoholism. For instance, he testified that he drank more than his doctor recommended and that his consumption and symptoms were consistent with an alcohol use disorder. Additionally, Lansdale's doctor testified that

Lansdale drank more than what was recommended, and Lansdale's wife testified that Lansdale drank nightly. However, Lansdale did not offer any expert testimony on his alcohol consumption, and his doctor testified that he had never applied any diagnostic criteria to Lansdale or noted any serious concerns. Furthermore, Lansdale's testimony was less than persuasive. A reasonably jury, weighing the credibility of the witnesses, could have found that Lansdale failed to prove that he suffered from a disability.

Additionally, a reasonably jury could have found that Lansdale failed to prove that his disability substantially limited one or more major life activities. At trial, Lansdale claimed that his alcoholism led to anger, caused anxiety, caused sleeping problems, limited his work activities, strained his relationships, and led to a lack of concentration. Again, however, Lansdale presented no expert testimony on these matters and at times stated that his anger, anxiety, and sleeping problems were caused more by the demands placed on him by UPS then by his alcohol consumption. UPS also admitted several times that Lansdale was an exemplary performer at work. A reasonable jury, weighing the testimony, could have concluded that Lansdale's alcohol consumption did not limit a major life activity.

Finally, a reasonable jury could have found that Lansdale's alleged disability was not a motivating factor in UPS' decision to terminate him. As stated above, UPS presented evidence and testimony about its investigation into Landale's corporate card usage, and about what the decisionmakers knew or thought regarding that usage. Just as importantly, UPS presented evidence and testimony that none of the decisionmakers considered Lansdale to be disabled. It is true that there were some comments, like those made by Angie Brewer, suggesting that some of the decisionmakers suspected that Lansdale was

covering up alcohol purchases, but those same decisionmakers repeatedly testified that they did not consider Lansdale to have an alcohol problem. Given the evidence presented at trial, a reasonable jury could find that UPS terminated Lansdale because of the issues regarding his corporate card usage and that his alleged alcoholism was not a reason on which UPS relied to make that decision.

Because the Court finds that a reasonable jury could have found for UPS on Lansdale's ADA and MHRA discrimination claims, the Court will deny his Renewed Motion for Judgment as a Matter of Law as to those claims.

### 2. Regarded as Disabled Claim

Lansdale also argues that a reasonable jury could not have found for UPS on his "regarded as" disability claim. For the reasons discussed above, the Court finds that a reasonable jury could have found that UPS did not consider Lansdale to be disabled and that any such belief was not a motivating factor in the decision to terminate him.

## II. MOTION FOR NEW TRIAL

### A. Standard of Review

Under Rule 59(a) of the Federal Rules of Civil Procedure, the Court may grant a motion for a new trial "on all or some of the issues." Fed. R. Civ. P. 59(a)(1). "A new trial is appropriate when the first trial, through a verdict against the weight of the evidence . . . or legal errors at trial, resulted in a miscarriage of justice." *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996). "The authority to grant a new trial is within the discretion of the district court." *Id*. Only if the jury's verdict is so against the great weight of the evidence

that it constitutes a miscarriage of justice should a motion for a new trial be granted. *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1010 (8th Cir. 2000). If a party contests the Court's evidentiary rulings, a new trial is warranted only if erroneous rulings "had a substantial influence on the jury's verdict." *Littleton v. McNeely*, 562 F.3d 880, 888 (8th Cir. 2009) (quoting *Harris v. Chand*, 506 F.3d 1135, 1139 (8th Cir. 2007)).

### B.    Contrary to the Weight of the Evidence

Lansdale first argues that he should be given a new trial because the jury's verdict is contrary to the weight of the evidence. As discussed above, the jury's verdict was not against the weight of the evidence, and the Court will not grant a new trial on this ground.

### C.    Evidentiary Rulings

Lansdale next argues that he should receive a new trial because the Court committed legal errors resulting in a miscarriage of justice. He asserts that the Court improperly denied motions in limine and overruled his objections that sought to preclude UPS from introducing certain evidence. He also argues that the Court improperly granted UPS' motion in limine prohibiting him from arguing that UPS was required to offer him a reasonable accommodation.

### 1.    Testimonial Evidence

Before and during trial Lansdale argued that UPS should be precluded from bringing certain witnesses or introducing certain documents that were not disclosed or produced during discovery. The Court repeatedly rejected Lansdale's motions and objections, finding that UPS had not committed discovery violations sufficient to justify the penalty Lansdale sought.

Lansdale now argues that the Court erroneously allowed four individuals—Ryan Finney, Brian Winter, Robert Delaney, and Elaine Penas—to testify. Finney, Winter, and Delaney were all Lansdale's subordinates at UPS, and Penas worked for a UPS client. Each of these witnesses testified, in part, about whether they had attended certain meals that Lansdale's expense reports identified them as attending. Each individual's name had been flagged by Faifer during her investigation because she suspected that they had not attended certain meals with Lansdale, contrary to his expense report entries.

Lansdale argues that the Court erred in allowing these witnesses to testify because they were either not disclosed during discovery, were disclosed late in discovery, or because the scope of their testimony was not disclosed during discovery. Essentially, he argues that he was ambushed by the testimony of these witnesses and that he had not been adequately notified that they would testify in such a way. Lansdale highlights several interrogatories and requests for production he served in the infancy of discovery and UPS' alleged failure to adequately respond to those requests in a way that captured the ultimate testimony of the witnesses. He asserts that, had UPS complied with its discovery obligations, he could have "secure[d] the business, travel and expense records of these witnesses . . . and/or conduct[ed] the depositions of such persons to properly prepare for the trial." (Pl.'s Mem. Supp. at 18, Mar. 5, 2019, Docket No. 386.) Instead, he claims he was "deprived of any meaningful opportunity to challenge or explain any inconsistencies in his business expense reports and the witnesses' recollections and beliefs." (*Id.*) As a result of these witnesses' testimony, "[t]he mood, feel, momentum and direction of the trial palpably changed." (*Id.* at 19.)

The base of Lansdale's argument is that UPS did not comply with its discovery obligations and that the Court impermissibly excused this conduct, to Lansdale's detriment. "When a party fails to provide information or identify a witness in compliance with Rule 26(a) or (e), the district court has wide discretion to fashion a remedy or sanction as appropriate for the particular circumstances of the case." *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008) (citing Fed. R. Civ. P. 37(c)(1); *Trost v. Trek Bicycle Corp.,* 162 F.3d 1004, 1008 (8th Cir. 1998)). Because one of the primary functions of discovery is to eliminate unfair surprise, a district court may exclude the information or testimony as a self-executing sanction unless the party's failure to comply is substantially justified or harmless. Fed. R. Civ. P. 37(c)(1). When fashioning a remedy, the Court may consider things such as "the possibility of surprise or prejudice to the [opposing party], the extent to which allowing witness to testify would disrupt the order and efficiency of the trial, and the importance of the witness's testimony." *Sellers v. Mineta*, 350 F.3d 706, 711–12 (8th Cir. 2003).

As an initial matter, the Court found that UPS did not commit a discovery violation. Each of these witnesses were disclosed to Lansdale as persons with knowledge of the accuracy of Lansdale's expense reports in a supplemental disclosure sent one month before the end of discovery. Lansdale thus had time to determine whether to "secure the business, travel and expense records of these witnesses . . . and/or conduct the depositions of such

persons to properly prepare for the trial," something he claims he was unable to do.[1] Because UPS did not violate the rules of discovery, the Court did not err in refusing to sanction UPS by prohibiting the witnesses' testimony.

However, even if UPS' late disclosure was a discovery violation ("failure to disclose in a timely manner is equivalent to failure to disclose," *Trost*, 162 F.3d at 1008), excluding these witnesses' testimony would not have been a proper sanction because Lansdale cannot reasonably claim surprise or prejudice. While the witnesses were not explicitly disclosed early in the discovery process, their role in this case was clear from the start. UPS immediately disclosed the Faifer investigatory reports and emails, which named all four witnesses and included her suspicions that they were not with Landale when he claimed. UPS also disclosed a written statement by Delaney attesting that he could not verify being present at some of the meals Lansdale claimed and the receipts from the meals that Faifer found questionable. Indeed, Lansdale admitted at trial that, at Faifer's deposition, he questioned her extensively about some of the receipts and the foundation for her belief that the witnesses were not in attendance with Lansdale. In short, Lansdale had ample notice that these witnesses' testimony would be relevant and had enough information to decide whether to inquire further about them or depose them. That he decided not to do so does

---

[1] Lansdale acknowledges that UPS supplemented its disclosures to include explicit mention of these individuals, but argues that the supplementation was relatively useless given that it came only a month before the end of discovery and after he had already secured certain concessions from Faifer and Gonzales during their depositions. The Court finds this argument unpersuasive given that Lansdale could have served whatever discovery requests he needed within that month or moved the Court for additional limited discovery given UPS' late disclosure.

not make UPS's actions prejudicial. Lansdale may have been surprised by these witnesses' testimony, but that surprise was either not reasonable or of Lansdale's own making.

Further, even if the Court erred in allowing the individuals to testify, Lansdale has not shown that the error "had a substantial influence on the jury's verdict." *Littleton*, 562 F.3d at 888 (quoting *Harris*, 506 F.3d at 1139). Here, Lansdale asserts that the allegedly harmful testimony of Finney, Winter, Delaney, and Penas changed "[t]he mood, feel, momentum and direction of the trial," and then concludes, without more, that he has "clearly demonstrated severe prejudice as a result" of the Court's error. (Mem. Supp. at 19-20.) But each of the contested witnesses also testified that they knew Lansdale to be an honest man with a reputation for truthfulness. Thus, while some aspects of their testimony were harmful, other aspects actually bolstered Lansdale's credibility.

Even ignoring the positive aspects of the contested witnesses' testimony, the harmful aspects of their testimony only corroborated other evidence presented by UPS. Had the Court excluded these witnesses' testimony, the jury would still have been told that Faifer flagged the meals about which they testified, that Lansdale's superiors had been told that Lansdale was likely falsifying his expense reports, that Lansdale signed a written statement acknowledging that he used his card for personal use, and that his superiors believed that he had committed misconduct.

Throughout the trial, Lansdale attempted to prove that Faifer's ultimate conclusions were wrong and that he had not misused his credit card. However, the Eighth Circuit has clearly established that "[t]he critical inquiry in discrimination cases . . . is not whether the employee actually engaged in the conduct for which he was terminated, but whether the

**employer** in good faith **believed** that the employee was guilty of the conduct justifying discharge. *McCullough v. Univ. of Arkansas for Med. Scis.*, 559 F.3d 855, 861–62 (8th Cir. 2009) (emphasis added)(citing *Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004); *Scroggins v. Univ. of Minn.*, 221 F.3d 1042, 1045 (8th Cir. 2000)). The ultimate question in this case was not whether Lansdale had engaged in wrongdoing, but whether UPS terminated him because of his alleged disability. Of course, one way to show discrimination is to establish that a termination was pretextual. But Lansdale presented no evidence that his superiors, who made the decision to terminate him, did not believe in good faith what they had been told: that Lansdale had violated company policy. With or without the contested witnesses' testimony, the jury was presented with sufficient evidence to find that UPS terminated Lansdale not because of his alleged disability, but because it believed he misused his company card.

Lansdale further argues that the Court erred in denying his motions in limine seeking to prohibit UPS from introducing evidence that he had requested, but never received, during discovery. He argues that "[t]he consequence to Lansdale was the Court opening the door to recurring and multiple forms of Defendant's witnesses' testimony and information which was **not** disclosed to Lansdale" and that "[t]he predictable results of such errors were surprise and prejudice to Lansdale." (Mem. Supp. at 22.) Lansdale does not specify which witnesses testified or what evidence was admitted that would not have been if the Court would have granted his motion in limine. He also does not describe how he was surprised and prejudiced or how this alleged error impacted the trial. Accordingly, the Court is unable to determine whether the Court erred or whether that error had a

substantial influence on the jury's verdict. The Court will thus deny Lansdale's Motion for a New Trial on this ground.

## 2. Reasonable Accommodation

Prior to trial, UPS brought a motion in limine to prohibit Lansdale from insinuating or introducing evidence that UPS was required to offer him a reasonable accommodation. UPS argued that Lansdale had not brought an ADA reasonable accommodation claim, thus it would create confusion and prejudice if he argued that UPS had any reasonable accommodation responsibilities. Lansdale, on the other hand, argued that he had brought a reasonable accommodation claim and that he should be allowed to present evidence that UPS did not engage in the required interactive process.

The Court granted UPS' motion in limine and prohibited Lansdale from arguing at trial that UPS was required to offer him a reasonable accommodation. (*See* Order on Motions in Limine at 8-10, Dec. 21, 2018, Docket No. 325.) The Court found that Lansdale could not support a reasonable accommodation claim even if he had brought one and that allowing him to argue as much would be highly prejudicial. (*Id.*)

Now, Lansdale asserts that the Court erred in granting UPS' motion because "the Court's reasoning . . . that an employer's duty to accommodate an employee is not triggered until the employee clearly requests an accommodation is incomplete and short-sighted analysis." (Mem. Supp. at 23.) He cites no case law for this proposition, and, as the Court explained in its previous Order, such a proposition is contrary to well-established law. The case law is clear that:

> Not only must the employee initiate the accommodation process by making the employer aware of the need for an accommodation, *see*[] *Peyton v. Fred's Stores of Arkansas*, 561 F.3d 900, 903 (8th Cir. 2009), but the employee must also provide relevant details of his/her disability and the reasons that the disability requires the requested accommodation[,] *EEOC v. Convergys Customer Management Gp.*, 491 F.3d 790, 795 (8th Cir. 2007).

*Stipe v. Shinseki*, 690 F. Supp. 2d 850, 878 (E.D. Mo. 2010).

It was undisputed before trial that Lansdale did not clearly request an accommodation. Further, Lansdale provided no evidence that he had informed UPS that his alleged disability required an accommodation nor that UPS believed that his disability required an accommodation. Lansdale's alleged disability, by itself, does not trigger the reasonable accommodation process. Instead, a disability must come with "resulting limitations." *Wallin v. Minn. Dep't of Corr.*, 153 F.3d 681, 689 (8th Cir. 1998) (quoting *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996)). The Court did not err in finding that Lansdale could not support a reasonable accommodation claim or in granting UPS' motion in limine on this issue.

Lansdale goes on to argue that, "[u]nder the Court's analysis, an employer could avoid having to engage in interactive dialogue and/or providing a reasonable accommodation altogether if the employer suspected the employee had a disability . . . and simply terminated the employee before engaging in the . . . process." (Mem. in Supp. at 23-24.) This argument highlights Lansdale's misunderstanding of the fact that a disability discrimination claim and a reasonable accommodation claim are two separate claims.

What Lansdale describes in this argument is not legal, but is instead an impermissible termination based on an employee's disability or an employer's belief regarding an employee's disability. Contrary to Lansdale's assertions, the Court's ruling did not create a loophole in the ADA by which an employer can get away with disability discrimination. Instead, the Court's ruling properly focused the parties on the relevant and sustainable ADA claims that were available to Lansdale, and did not allow the jury to hear irrelevant and possibly prejudicial arguments on reasonable accommodation.

### D. Jury Instructions

Lansdale also moves for a new trial based on improper jury instructions. An error in jury instructions justifies a new trial "only if the error 'misled the jury or had a probable effect on its verdict.'" *Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 460 (8th Cir. 2013) (quoting *E.I. du Pont de Nemours & Co. v. Berkley & Co.*, 620 F.2d 1247, 1257 (8th Cir. 1980)). "There is no harmful error if the instruction, in general, correctly instructs the jury, even if one portion is technically incorrect." *Westborough Mall, Inc. v. City of Cape Girardeau*, 794 F.2d 330, 335 (8th Cir. 1986). "The test is not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues." *Id.* (quotations omitted.)

Jury instructions "viewed on the whole," should "fairly and adequately represent the evidence and applicable law in light of the issues presented to the jury in a particular case." *Klisch v. Meritcare Med. Grp., Inc.*, 134 F.3d 1356, 1358 (8th Cir. 1998). How the Court crafts jury instructions is within the Court's sound discretion. *Reed v. Malone's*

*Mech., Inc.*, 765 F.3d 900, 907 (8th Cir. 2014). Challenges to jury instructions must be reviewed in the context of the overall instructions, not just a single word or sentence. *See Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1331 (Fed. Cir. 2010). Jury instructions need not be "technically perfect or even a model of clarity," *Reed*, 765 F.3d at 907 (quoting *McCoy v. Augusta Fiberglass Coatings, In*c., 593 F.3d 737, 744 (8th Cir.2010)), and the Court "need not use any particular form of words or sequence of ideas so long as the charge as a whole conveys to the jury a clear and correct understanding of the applicable substantive law without confusing or misleading them," 9C Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2556 (3d ed. 2017) (footnote omitted). "It is axiomatic that the trial court should charge the jury in plain language. It should not use technical or obscure legal phrases if the legal rule can be stated in less formal words." *Id.*

### 1.    Tangible Injury

As stated above, to prove a disability-related inquiries claim, an employee must show that the prohibited inquiries caused a tangible injury. *Cosette v. Minn. Power & Light*, 188 F.3d 964, 970 (8th Cir. 1999). In the jury instructions and special verdict form for this claim, the Court instructed the jury that it could find for Lansdale if UPS made an unlawful inquiry and that inquiry "caused his termination." (Jury Instructions at 18; Special Jury Verdict at 6.) Lansdale objects to the Court's limitation of his tangible injury to only include termination. He argues that he only needed to prove a tangible injury to succeed on this claim and that the Court's limitation was an error mandating a new trial. The Court disagrees.

It may be true that in a hypothetical case a plaintiff need only prove a tangible injury, and tangible injuries might include things other than termination, such as emotional distress. However, this is not a hypothetical case, and the Court specified Lansdale's relevant injury for the jury for two reasons. First, the Court found that the only tangible injury supported by the evidence was Lansdale's termination. Before trial, Lansdale himself repeatedly specified that the relevant injury stemming from the allegedly unlawful inquiries was his termination. In arguing for summary judgment on this claim, he stated that "UPS's decision to terminate Lansdale immediately following" the Faifer and Gonzales interview "obviously demonstrates tangible injury resulting from the prohibited inquiries." (Pl.'s Summ. J. Mem. Supp. at 13, Feb. 20, 2018, Docket No. 27.) Lansdale made the same argument in his statement of the case. (Statement of Case at 38, Dec. 3, 2018, Docket No. 283.) While Lansdale now attempts to argue that he suffered emotional distress as a result of the inquiries, at trial he largely testified that he suffered such distress because of his termination and the effects of that termination. Considering the evidence produced at trial, the Court found no basis to conclude that the alleged prohibited inquiries caused any tangible injury except for termination and limited the instruction accordingly.

Second, given that the evidence pointed only towards termination as a plausible injury, the Court found it improper to give the jury such an amorphous term as "tangible injury." Jury instructions should not contain "technical or obscure legal phrases" where such phrases can be prevented. "Tangible injury" is not a common phrase that the average juror is likely to understand; instead, the average juror could easily misconstrue such a phrase or what harms it might actually encompass. Instead of providing the jury with such

a term—and considering the evidence produced at trial—the Court found it preferable to clearly define the injury.[2]

### 2. Spoliation

Lansdale requested that the Court include a spoliation/adverse inference jury instruction, based on UPS' failure to maintain and/or produce his personnel file despite federal regulations requiring the maintenance of such files for at least a year after termination. *See* 29 C.F.R. § 1602.14. Lansdale requested that the Court inform the jury that it could infer that whatever was in the personnel file would have bolstered his case. The Court denied his request. Lansdale now argues that the Court should have included a spoliation instruction and that the Court erred in failing to include one.

For support, Lansdale cites *Favors v. Fisher*, 13 F. 3d 1235, 1239 (8th Cir. 1994), in which the Eighth Circuit upheld a district court's decision that a plaintiff was entitled to a presumption in a similar situation. Clearly, as *Favors* demonstrates, it was within the Court's discretion to include the instruction Lansdale requested. However, neither *Favors* nor 29 C.F.R. § 1602.14 mandates that such an instruction be given, and the Court did not err in refusing to give one. Generally, "[i]n order for an adverse inference instruction for spoliation to be warranted, a district court is required to make two findings: '(1) there must be a finding of intentional destruction indicating a desire to suppress the truth, and (2) there must be a finding of prejudice to the opposing party.'" *Burris v. Gulf Underwriters Ins.*

---

[2] The Court's concern in this area was furthered by Lansdale's imprecise arguments during the trial regarding tangible injury. Lansdale never put forth a clear explanation of any injury he was alleging other than termination, perhaps attempting to utilize the phrase's ambiguous meaning.

*Co.*, 787 F.3d 875, 879 (8ᵗʰ Cir. 2015) (quoting *Murley*, 703 F.3d at 460). Lansdale presented no evidence of either. Although it is clear that UPS did not produce the personnel file Lansdale was seeking, Lansdale did not produce any evidence from which the Court could conclude that UPS's inability to locate the file meant that UPS destroyed the file in bad faith. In discovery, Lansdale requested the personnel file but did not, as he could have, request any information about how UPS stored its personnel files or about how the specific file may have been destroyed. *See Escamilla v. SMS Holdings Corp.*, Civ. No. 09-2120 (ADM/JSM), 2011 WL 13243580, at *29 (D. Minn. June 28, 2011) (discussing a plaintiff's pretrial discovery options to seek such information.) Further, while Lansdale asked several deponents about his personnel file, he was told that it simply could not be located and that no one knew precisely why it could not be located. Finally, Lansdale produced no evidence at trial to support a conclusion of intent or bad faith on the part of UPS; he simply asked several witnesses whether they ever located the file. In short, Lansdale provided no basis for the Court to conclude that UPS destroyed or otherwise refused to produce the personnel file in bad faith.

Additionally, Lansdale provided the Court with no reason to conclude that he was prejudiced by UPS's alleged spoliation. He never explained what might have been in the personnel files. That he was a strong performer was not in dispute; UPS repeatedly acknowledged that fact at trial. Instead, Lansdale simply asserted that UPS failed to comply with 29 C.F.R. § 1602.14 and that a spoliation instruction was therefore warranted. However, the Court is unaware of any cases applying that provision in such a strict manner and the Court was therefore not required to give a spoliation instruction. Spoliation

instructions "create[] a substantial danger of unfair prejudice" when not warranted, *Morris v. Union Pac. R.R.*, 373 F.3d 896, 903 (8th Cir. 2004), and Lansdale provided no evidence that UPS acted in bad faith. As such, the Court did not err in finding that a spoliation instruction was not proper or warranted.

### 3.  Miscellaneous Arguments

Finally, Lansdale makes a blanket argument that the Court erred in declining to include all of the instructions and definitions he requested in a letter and email he sent to the Court and UPS during the trial. After considering all of Lansdale's arguments and reviewing the proposed instructions, the Court finds that the jury instructions to which Lansdale objects were legally correct because they fairly and adequately represented the evidence and applicable law in light of the issues presented to the jury in this case. Thus, the Court finds no basis for granting Lansdale a new trial in any of these miscellaneous and, at times, nonspecific arguments.

## III.  MOTION TO AMEND THE JUDGMENT

Lansdale alternatively requests that the Court amend the judgment in his favor pursuant to Federal Rule of Civil Procedure 59(e). "Rule 59(e) motions serve a limited function of correcting manifest errors of law or fact or to present newly discovered evidence." *Innovative Home Health Care v. P.T.-O.T. Assoc. of the Black Hills*, 141 F.3d 1284, 1286 (8th Cir. 1998) (quotations omitted). The Court "has broad discretion to alter or amend a judgment under Rule 59(e)." *SFH, Inc. v. Millard Refrigerated Servs., Inc.*, 339 F.3d 738, 746 (8th Cir. 2003). For all of the reasons discussed above, the Court does

not find that any manifest errors of law justify an amended judgment, and Lansdale does not present any new evidence. Accordingly, the Court will deny this alternative request.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Judgment as a Matter of Law, Motion for a New Trial, or, in the alternative, Motion to Alter/Amend/Correct the Judgment [Docket No. 383] is **DENIED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  July 23, 2019                                       s/John R. Tunheim
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                                                    Chief Judge
                                                        United States District Court